# SUPREME COURT.

ALEXANDER HOLLAND, treasurer, etc., agt. STEPHEN B.
HAYMAN.

Where in an action for the conversion of money by the defendant, received
in a fiduciary capacity, the defendant sets up as a defence that he was
robbed of the money while traveling in a railroad car, and the case is
referred to a referee, who finds that the evidence is not sufficient to estab-
lish it as a fact that the defendant had taken or converted the money in
dispute,—*Held*, on appeal, that there being no exception in the case except
the exceptions to the report, while it must be conceded that the evidence
as reported is sufficient to create grave doubts as to the fact of the robbery,
it is not sufficient to prove a case entitling the plaintiff to recover money
from the defendant.

*New York General Term, November*, 1872.

APPEAL from a judgment at special term in favor of the
defendant.

ANDREW H. H. DAWSON, *counsel for plaintiff, appellant.*

The complaint in the above action sets forth that on the
11th day of March, 1868, defendant was in the employment
of plaintiff as an express messenger, and, as such messenger
on the Cincinnati, Hamilton and Dayton railroad, had posses-
sion of $20,000, which sum he there and then embezzled.
The defendant's answer traverses only the embezzlement; all
other allegations of the complaint are admitted.   To establish
the embezzlement plaintiff relies on the testimony of some
fourteen witnesses and defendant's own explanation of the
non-delivery of the money, or, more accurately speaking, his
*explanations*, for in speaking about it at different times and
places, his testimony has been "one thing in Jerusalem and
another thing in Rome."   In order to make our way to the
truth short, direct, clear and easy, I will first put defendant's

Holland agt. Hayman.

own written exculpatory statement, sentence by sentence, through the crucible of an analysis, and as I proceed will call your attention to such established facts and fortunate circumstances as I shall claim conspire to brand every word of it as inventions and to force upon the mind the conviction that the whole affair was, in the slang parlance of the day, "a put up job." Immediately after the occurrence of the ·alleged robbery, while surrounded by sympathizing friends on the train, defendant stated that between Glendale and Lockland three men in masks entered the express car by its front door and robbed him. The first question to be settled, then, is, did *any* person or persons enter that express car *front* door that night between Glendale and Lockland, and if yea, how many? Defendant says three men did it. I say nobody did. Now to the proof. Affirmatives are always much more susceptible of proof than negatives, and I will admit defendant starts with that advantage, but how long does he keep it? What is the nature and character of the evidence by which he proposes to establish in this issue the affirmative? Simply his own uncorroborated statement. Has he introduced any reputable witnesses to establish for himself a high character for integrity in order to entitle his naked story to consideration? Nay, not one. Then it becomes our stern duty to scan with the severest scrutiny the peculiar circumstances under which the *alleged* robbery occurred and under which he *modestly* asks us to take his mere word for so much; and the first question that seems to demand an answer from this outlook is, did he have anything to dread on the one hand or gain on the other that to prevent or accomplish falsehood might, under certain circumstances, better serve him than could truth, and to this question the answer is bound to come that "certainly he did." In the first place, embezzlers in Ohio have to face the gaping jaws of a hungry state prison, and if he was, as I contend the evidence conclusively proves, guilty of that very crime on that very occasion, then that he should be ready with all manner of lies coined to circulate for the purpose of diverting atten-

tion from his guilt should excite no surprise; and on the other hand, if of embezzlement he had been guilty then and there, then he had quietly bagged the snug little sum of $20,000, and to lie had the double inducement to be found in coveted protection and profit.   He could not speak the truth and escape conviction or keep the money.  What did he commit the crime for but to get the money, and if he was depraved enough to trample on the laws of man which inhibit stealing, would he probably be found too conscientious to trample on the divine canon which says thou shalt not lie? There is no other passion under the despotism of which fallen man will stoop, in meanness so low or sore, in recklessness so high, as under that of avarice.

Defendant's exculpatory explanation, then, it would seem, has to depend upon its own merits, as he has not dared to set up any pretensions whatever to merits of his own to sustain it, and, unfortunately for him, when we attempt to ascertain what *its* merits are, we find that it is not only wofully deficient in plausibility, but, instead of being, as the truth always is, corroborated by contemporaneous circumstances, it is categorically contradicted by every fact, incident and circumstance that has casually or otherwise come to light in the history of this affair.   While, then, the affirmative is supported only by the assertions and assumptions of defendant, the negative is supported by the positive proof of conductor Greely, which is corroborated by the concurrent testimony of witnesses Hatmaker, Skillman, Hazen and Ellis, as well as by every circumstance connected with the occurrence, and every word the defendant himself uttered at the time or subsequently about it.   Conductor Greely swears that when the train left Glendale he stepped off of the depot platform on to the rear platform of the first passenger coach in front of the express car, and took the last seat in the rear end of that coach, from which he had through the rear end window a full and plain view of the express car front door, and of more than half of the coach and car platforms intervening; that when

Holland agt. Hayman.

the train left Glendale no person *was on either of those plat-forms*, or could have gotten on, or have survived an attempt to get off, between Glendale and Lockland, as they were running fifty miles per hour to make up lost time; that between Glendale and Lockland no person *passed through said passenger coach towards the express car*, and finally in terms distinct, positive and emphatic he says that between Glendale and Lockland *no* human being that night *passed into that express car through its front door.* This witness, remember, elsewhere testifies that for fifteen years he has filled the post of a passenger coach conductor. This fact is pregnant with significance. The first conclusion we must draw from it is, that he must enjoy an amount of railroad official confidence commanded only by men of incorruptible integrity, and the second conclusion that follows naturally is, that he must be endowed with the highest qualifications for an office he has filled so long.

I must be permitted to insist that his testimony, as to a fact that involves the habit and gift of observation, is entitled to far greater weight than the same testimony would be emanating from a witness equally respectable and equally intelligent, but whose habits and duties did not so constantly press his observation into scout and skirmish service as did his.

But, fortunately, Mr. Greely's testimony is corroborated by that of Skillman, who states *no person was on those plat-forms* when he, passing through the express car, where he saw defendant alone, passed into that same passenger coach only one minute before defendant, says he was robbed. Defendant knowing how necessary it would be for him to show, to beguile suspicion, that he had not surrendered to robbers without making a manly display of resistance, tells witness Hazen that when the robbers assailed him he grappled with them and a *struggle* ensued. Hatmaker swears that he was lying on a table in the adjoining mail-room, between which and the express room there was nothing but a very thin flooring partition, and that had any *struggle* have

occurred, then and there, he *must* have heard it, and *that he heard none.* Here, then, is another clear corroboration for Greely, and peremptory contradiction for defendant.

Ellis swears that when he went into the express car with Hat-maker and Nye, while defendant was still lying where those *terrible robbers* had knocked him *senseless* on the floor, there was not the first sign or evidence that anything like a *struggle* could have recently been enacted there. Here, then, is the concurrent testimony of four unimpeachable witnesses to facts and circumstances, all of which directly tend and con-jointly conspire to prove that when defendant said that between Glendale and Lockland three robbers, in masks, entered that express car front door that night, that he wan-tonly and willfully lied.

And the next paragraphs in his statement, to which I beg your permission to attract your special attention, are in the following language ; " The packages I got along the road I was rotating with the bills when I was robbed ; I had the packages and bills on my lap, the packages next to me and the bills front of me; as I took the packages I looked at it ; I laid it on the top of the safe-door ; I had, perhaps, six packages on my safe-door ; this was the time the robbery took place, which was, perhaps, half-way between Glendale and Lockland."

By the testimony of Mr. Clark, plaintiff proved that there was on that " run " that night sixty-two money packages and twelve packages of jewelry and other valuables. By the tes-timony of witnesses Clark, Holton and Greely, a striking external resemblance between these twelve packages and the money packages is established.

This important fact defendant does not, nay, dare not, dis-pute. Greely says *he* mistook one of them for a money package. Witnesses Clark, Holton and Edmunds all swear that *every one* of these *jewelry* packages came *safely to hand*, but of the money *not one dollar did*. Look *at this fact* from whatever stand-point you may, and admit, you must, that it

is an inscrutable mystery. But the moment you begin to look *into it* the mystery vanishes. If the robber was a highwayman, this feature amounts to a fathomless riddle. If the defendant was himself the thief, it ceases to be a riddle.

Had that man that got that $20,000 have been a highwayman, those jewels, instead of coming safely to hand, would have been offered for sale in forty-eight hours afterward in St. Louis, or, perhaps, in New York city. Whereas the defendant, if he did not have a name, did have a local habitation, and that jewelry was destined for that very vicinity. He could neither wear it or sell it without inviting detection. Jewels are not only easily susceptible of identification, but being worn as they are to ornament the person, are more liable to be noticed than any other species of property.

On the night this money disappeared the messenger had in his possession seventy-four packages; sixty-two were money, and twelve jewelry. These facts you will find in Mr. Clark's evidence. Those packages were addressed in seventy-four different and distinct styles of writing, some of them more, others less, legible. Defendant states that when he was robbed he was engaged checking them off on his way-bill or report, and that he had checked off "perhaps six packages," and that the rest were in his lap. Hatmaker testifies that not more than one minute had elapsed from the time he saw him alone in his express room before he heard him groan, and rushed to his relief, and when he reached him he found him still alone but prostrate, and *apparently senseless* on the floor. There were no robbers *there then, nor signs that any had been there.*

The distance from Glendale to Lockland is four miles. Defendant says he was robbed about half-way between Glendale and Lockland, and Greely testifies that the train was running fifty miles an hour, which would bring it to Lockland in two minutes and twenty seconds from the time defendant says he was robbed. These facts assist us, with the evidence of Hatmaker, to ascertain about how long those

*redoubtable* robbers were engaged in putting defendant through, and under no aspect of the case can it be pretended that they occupied his attention over two minutes, and to credit defendant's story, you believe that three robbers (probably illiterate) rushed into his car, assailed him with a *pistol barrel,* knocked him senseless, and then, in the space of two minutes, gathered up seventy-four money and jewelry packages, and, carefully and correctly reading the indorsements made upon their backs and faces, separated the money from the jewelry, and decided to take the one and to leave the other, something they would not have done if they could, and could not if they would.

When Greely asked defendant, immediately after the *alleged* robbery occurred, what amount of money he had on that " run," defendant answered $20,000. How did he come to know that? Did he not tell Sloan that when he was robbed he was engaged checking off his packages, and had checked off only " perhaps six packages?" How did he know, then, what was in the rest? Does his statement to Sloan not show that the train had been stopping at all the depots between Richmond and Glendale, and that he had been putting off and taking on freight and money all along the route? Was that not enough to have kept him busily occupied? How did he come to know, then, I repeat, how much he had on that " run?" There can be but one answer. He had carefully gone over that long catalogue of packages, and added up the sixty-two distinct items. *What did he do that for?* He had a motive for doing it, and what other motive could he have had, to unnecessarily thus overtax his jaded mind and limbs, but to ascertain whether the aggregate amount in his possession that night was large enough to justify putting up a job to get away with. Hatmaker testifies that about one minute after Skillman passed through the express car into the next coach, he (witness) went into the express car and asked defendant how soon he " would be through with his work," and that he answered " in a few

Holland agt. Hayman.

moments," when witness added, "when you get through come into the mail room," which defendant *promised to do.* Yet defendant gives, as an apology for not giving the alarm when he was assaulted, that he did "*not know any one was near.*" To Greely, on the train, and to Clark and Hazen, at his room in Cincinnati, defendant stated that he had been robbed by three robbers, but to Mitchell, subsequently, and on the 14th of the following July, to Sloan, at Indianapolis, he dropped a robber, and stated that he had been robbed, not by three, but by two. To Sloan he described these robbers as "*common-sized men,*" but to Hazen he said one was a "*big, tall,* and the other a *chuncky* man."

These contradictions in his own narrative utterly destroy its reliability, even if it were not, as it repeatedly is, flatly contradicted by unimpeachable witnesses, the light of science and the laws of nature.

Hatmaker stated that, just before hearing defendant groan, he heard a door slam. Doubtless that was the front door of the express car. Defendant had most probably gone to that door to see whether there was any person on those intervening platforms on his way to the express car, who might prove an inopportune intruder in the midst of an attempt upon his part to sufficiently scare up his own frontispiece to furnish a basis for a robbery rumor, and so, instantly upon discovering that the coast was clear, he went in upon himself, and, in thirty seconds, whipt his fight, overpowered himself; in fact, mauled himself into what the doctors call a comatose condition. He made out, however, to groan lustily enough to summon Hatmaker to his side, who found the poor, badly abused youth prostrate and *senseless* upon the floor.

Hatmaker, never dreaming that defendant was playing possum on him, and that he himself was playing the part of an alarmist in a farce, rushed into the next car for assistance, and soon returned with witness Ellis and a Mr. Nye. When they entered the express car, there they found defendant in a state of admirably preserved insensibility, *sitting up in his*

*chair*, a patient candidate for the office of a good Samaritan;
and, while he was in this comatose state, and these benevo-
lent gentlemen were exerting themselves to revive him, all
at once, without any known cause or perceivable provocation,
he flew suddenly, in the very face of his friends and of science,
and commenced walloping the one and illustrating the vaga-
ries of the other.   His friends beat a retreat, but the issue
between him and science will not be settled until your honor
adjudicates this case.   He pursued his friends, however, into
the next coach, where, Ellis tells us, he immediately " calmed
down." and commenced talking rationally, telling Greely and
Hatmaker *correctly* where his safe key could be found, and
telling Greely *correctly* how much money he had in that
" run;" and right here it is that science steps in, and, in a
most malignant and perverse spirit, tears into tatters and
doll rags the flimsy woof and web of his simulations so cun-
ningly designed to impose upon half-educated ignorance.

   Yet defendant's physical strength returned before his
mental, for Ellis swears that he commenced muttering non-
sense about getting even with sons of bitches, and, at the
same time, striking out indiscriminately at everybody about
him.

   Now, for months, this defendant has, through his learned
and able counsel, known that every word of this testimony
would be read on this trial, and yet not one word of evidence
has been introduced, either to refute it, if it be theoretical
error, or to prove that, if it be correct, his condition at the
time was exactly what medical gentlemen say it would have
been if he really had been knocked insensible.   The truth is
that, instead of being knocked into a comatose condition,
he was not injured at all.   Hazen and Mitchell say they
examined his wounds, and that they were *slight;* and Mitchell
says they had the appearance of having been made with
a pistol barrel, with the *cock down (in the hand)*.

   The truth, doubtless, is that defendant *dared not* call a
physician at the time.   A skillful surgeon might not have

Holland agt. Hayman.

been readily found able or willing to swear that from those little scratches, all *in one place*, over the right eye of the defendant, concussion could, in the nature of things, have ensued; and that is, I dare say, the true and only reason that can be given for his not having called in, at the time, a physician; or, if he did, does not call him to the witness stand in this action. Greely and Hatmaker state that all the doors to the express car were closed and locked that night between Glendale and Lockland. They also testify that the side doors could be opened only from the *inside*, and the end doors only with a pass key from the *outside*. Skillman testifies that he had just passed through that end front door, and closed it behind him; and defendant proves it was closed when he alludes to the manner in which it was opened by his abrupt visitors. But if it be true that he was robbed by highwaymen, how does it come that they had pass keys to his own door, and so fortunately happened to stumble in upon him when he had a money "run" of $20,000, instead of selecting some other night when he had but little or no money. These two facts call upon him more than upon any other person, trumpet-tongued, for an explanation. Admit that others might have furnished pass keys to robbers, yet who but himself could have told them when to come?

If there were any robbers on that express car that night, whence did they come and whither did they go? Hatmaker was lying in the mail-room with his face to the passage-way leading from the express, past the mail, to the baggage-room, and he swears nobody passed one way or the other through that passage-way between Glendale and Lockland. Greely was on guard at the same time over the front door of the express car, and swears that nobody entered it or fled through it. Greely, Skillman and Hatmaker all swear that all the doors to the express car were closed and locked; and what I want to know now is, if there were any robbers in it that night, at that time and place, how *did* they get *in*, and how *did* they get *out?*

I beg leave, in conclusion, to call your attention to the fact that not one dollar was received that night at Glendale by defendant, nor was one dollar ever shown to have been in defendant's possession, either when they arrived there or subsequently. My theory is that he had a confederate, to whom, after carefully separating the money from the jewelry, he handed the money, either at Glendale or at the first station beyond it, and that, had he been searched that evening, nothing would have been found on his person. Plaintiffs want a judgment in this case for two sensible purposes; first, they want to be able to make it out of defendant, if he is ever able to pay it, and, even more than that, they want to teach all thieves and scoundrels that when they abuse their confidence, they will invite a pursuit and punishment from which they can never escape; that through all of life's winding ways, they are doomed to be hunted down as outlaws, and that, too, by the surest and swiftest vengeance of justice; and that this court does, and all courts do, sympathize with such sentiments, I dare say your judgment in this case will testify, and exercise a salutary influence to restrain the predatory propensities of all men base enough to trample upon law, abuse private confidence and rob generous patrons.

IRA D. WARREN, *counsel for defendant, respondent.*

THIS action is brought against the defendant for converting to his own use $19,500 of the plaintiff's money.

The allegation in the complaint is that on or about the 11th day of March, 1868, the defendant unlawfully took, used and carried away from the plaintiff and converted to his own use that amount of money belonging to the plaintiff. The answer is a positive *denial.*

The plaintiff neither alleges nor proves a demand and refusal, so that the question here is, whether or not the plaintiff has established the fact that the defendant was guilty of a *felony.* Under the pleadings and proofs they have taken that *burden* upon themselves.

Holland agt. Hayman.

The referee finds that the defendant did not convert the money, and to that finding the plaintiff has excepted, and now brings this appeal.

The question, therefore, involves an examination of the entire evidence, unless the court should say that where the result is deduced from a variety of conflicting and inconsistent circumstances, and where there is not a particle of direct evidence, that it is a question *wholly* for the referee or jury.

The first presumption in this case which the plaintiff must overcome, is the defendant's *innocence*, and that is so strong that even where guilt can only be established by proving a negative, that negative must be proved by the party alleging the guilt, though the general rule of law devolves the burden of proof on the party holding the affirmative. (1 *Greenleaf's Evidence, p.* 41, § 35.)

The next presumption the plaintiff must overcome on this appeal is the presumption that the judgment is *right,* and I claim that before the court will reverse this judgment or the decision of the referee, founded on a variety of circumstances alone, in regard to which intelligent men may differ, the plaintiff must satisfy the court that these circumstances are consistent with *no other theory* but the defendant's guilt. (*Earnest* v. *H. R. R. R. Co.,* 35 *N. Y.,* 10.)

If the defendant can show that the evidence is far more consistent with the guilt of two other men who figured in this transaction, than with his own, the judgment will not be disturbed.

This is the first action of trover I have ever known where there was no direct evidence that the defendant took or kept a single dollar of the property.

When the plaintiff asks the court to presume, from a variety of conflicting circumstances, that the defendant not only committed a felony, but that he robbed himself and then inflicted cuts and blows on his own head sufficient to render him almost helpless and confine him to the house for a long time; and that in a case where he was found five minutes after the robbery at his post with his face covered with blood, and so

Holland agt. Hayman.

injured that these witnesses tied up his head, removed him to his home in a wagon, the safe open, the money gone, and the defendant there in the condition described, with his pistol broken into three pieces. There is no evidence that he exhibited in his conduct any evidences of guilt, or that any person at the *time* had the least suspicion that the defendant committed the robbery, and no evidence that a dollar of the stolen property was ever found in his possession or in any way traced to him, or that there was any confederate about him. When called upon he gave a full, clear and consistent statement of the whole occurrence. He states that two men came into the car with masks on, knocked him down and robbed him.

Let us see whether there is anything in this testimony consistent with a different theory than the plaintiff's.

The two last persons in the express car were Hatmaker, the baggage master, and Skillman, a vender of omnibus tickets. He swears that after the train left Glendale, which was just before the robbery was committed, he went from the express car into the forward passenger car after the train was in motion; that he shut the door after him. Greely contradicts this; for he says no one was on the platform after the train left Glendale; that it would have been impossible.

Nobody saw Skillman after this on the train. At the next station the tracks of one man were found leading from the cars on the opposite side from where passengers usually get off.

Hatmaker states that he and Skillman were in the express car after it left Glendale. Skillman has tried to account for himself. How does Hatmaker account for himself? He says he went into the mail-room and laid down. It was a separate room; the cars were running forty miles an hour. He says in a short time he heard a door slam, and then a groan. Is it *possible*, with a car running forty miles an hour, to hear a groan in the next room? I answer no. You can scarcely

hear the roar of thunder when sitting in the stillest running cars. He then went into Hayman's room and found him. The two masked men had gone. Skillman was not seen again. The *money* and Skillman were gone but the defendant was there, his face covered with blood, and his pistol broken into three pieces. Were the men masked because they were *known ?* Take this with Hatmaker's testimony "that no one could get in from the *outside,* that he was washing Hayman off when the train checked up for Lockland, that he did not tell the conductor until the train reached Carthage," and ask who committed this robbery, Hatmaker and Skillman, or this defendant.

The plaintiff's theory is that the defendant robbed himself; that he inflicted on himself all the wounds discovered; that no one went into the express car, and no one came out; and that it was impossible for any one to have done so without being seen by Hatmaker or Greely. After the car left Glendale, and a few minutes before the robbery, the defendant had all these packages of money on his lap, making up his accounts as usual for Cincinnati. *What became of all these packages of money ?* No one went out of the car after it left Glendale but Skillman. Does the plaintiff's theory account for this disappearance ? Did the defendant put them in his pocket and remain there exposed to certain detection ?

Is this consistent with human nature, or the experiences indicative of guilt? In the light of human experiences, is not this theory a simple *absurdity ?*

A judgment must be founded on *evidence,* and not on the vague speculations and visionary theories which my learned friend's brilliant and active imagination creates, and which he urges with much earnestness and zeal.

Strip my learned friend's argument of all the creations of his fancy, and there is nothing left but the pleasing recollection of a display of vigor and energy worthy of a better cause.

The referee, in his opinion on the facts, has arrived at the only rational conclusion an intelligent mind could arrive at on this evidence.

The evidence shows, and it is conceded, that the plaintiffs have failed on all their criminal prosecutions against this defendant, the judge directing an acquittal on the plaintiffs' evidence.

The plaintiffs have prosecuted and persecuted this young man in every conceivable form, with a persistent determination to stop when they have finally effected his ruin, or death shall have taken him to the kinder custody of the grave.

My learned friend has, from the beginning of this prosecution, adopted a *theory* of this case, and clung to it with the same perversity of affection which sometimes leads a mother to select the monster or idiot of the family as the object of her especial regard.

Though beaten time after time, he believes in it still. He is ready to sacrifice every other rational view to maintain his pet *theory ;* and he does it with a zeal as indefatigable as that which the poet ascribes to the stately goddess, who tired out her immortal horses in the work of raising the nations against Troy, and who offered to give her darling Sparta up to destruction if only she might once see the smoke going up from the palace of Priam.

One observation further on this evidence and I have done. The court will observe that the testimony of the doctors, who were called as experts, is founded upon hypothetical cases, not warranted by any evidence in this case. Take Dr. Dawson's testimony. Who says that the blow produced " *entire insensibilitg*" for two or three minutes ? Nobody.

Dr. Murry is founded upon the erroneous supposition that there was evidence that the blow rendered him " *entirely insensible*" for two or three minutes ; whereas, nobody swears to any such thing.

When a medical expert is called to swear away a man's

life or his money, he should be given the *exact facts;* for the *uncertainty* of his science is quite sufficient for human nature to endure, when based upon the exact facts of the case.

We again repeat what we consider to be the legal rule, applicable to all this mass of evidence, viz.: If a party relies upon circumstantial evidence to make out a case, the circumstances must be entirely inconsistent with any other conclusion than the one he seeks to maintain.

If the referee or jury might have adopted a different conclusion, which is consistent with all the circumstances proved, the court will not disturb the findings.

The referee in this case did determine that the circumstances proved would not justify him in holding this defendant guilty, and we say he is fully sustained and justified from the evidence.

We therefore ask that the judgment be affirmed, with costs.

*By the Court,* LEONARD, *J.*—The plaintiff's counsel suggested at the argument that the referee had given undue consideration to the defendant's statement of the robbery, on the ground that the statement had·been introduced in evidence on the part of the plaintiff, and that he, for that reason, was precluded from disputing its truth.

No such question was raised at the trial, nor does it appear that the statement had any such influence with the referee as was suggested.

There was no objection at the trial to the admission of evidence tending to prove that the statement was untrue, nor does the referee mention it in his opinion. He puts his decision upon the ground that the evidence is not sufficient to establish it as a fact that the defendant had taken or converted the money in dispute.

There is not an objection or exception in the case, except the exceptions to the report.

While it must be conceded that the evidence is sufficient to create grave doubts as to the fact of the robbery, it

is not sufficient to prove a case entitling the plaintiff to recover.

It is too indefinite and uncertain to authorize money to be taken from the defendant for the benefit of the plaintiff.

The judgment should be affirmed, etc.